* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The employee is Candy Strezinski.
2. The employer is the City of Greensboro.
3. Risk Management Services is the carrier on the risk.
4. At all relevant times, defendant-employer regularly employed three or more employees and was bound by the North Carolina Workers' Compensation Act. The employer and the employee relationship existed between the employer and the employee on or about March 17, 2003, the date of the alleged occupational injury resulting in occupational hearing loss.
5. Plaintiff's average weekly wage was $643.81, which results in a weekly compensation rate of $429.42.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was forty (40) years old as of the date of the hearing before the Deputy Commissioner. Plaintiff began employment with defendant on July 1, 1997 as a telecommunicator. As of the date of the hearing before the Deputy Commissioner, plaintiff worked as a supervisor with Guilford Metro 911. Prior to her employment with defendant, plaintiff worked as a 911 operator in Lucas County, Ohio for approximately seven years.
2. As a child, plaintiff suffered from recurrent ear infections requiring treatment by a physician. These problems continued into adulthood. Plaintiff also has a history of allergy to dust mites, and has experienced significant problems with upper respiratory infections. Plaintiff has been treated at the Karam Family Practice for ear infections, sinusitis, bronchitis, acute labyrnthitis, upper respiratory infections, allergic rhinitis, asthmatic bronchitis, pharyngitis, and bilateral Eustachian tube dysfunction.
3. In 1996, plaintiff was living in Ohio and working as a dispatcher for the Lucas County Police 911 Center. In late 1996, plaintiff experienced a problem with decreased hearing and ear infections, including drainage from both ears.
4. Plaintiff continued to experience problems with ear infections and decreased hearing following her move to North Carolina in 1997. On February 4, 1997, plaintiff was evaluated by Dr. James J. Crossley, a board certified otolaryngologist in Greensboro, for complaints of drainage from both ears and decreased hearing. Upon examination, Dr. Crossley noted erythematous portion of the left ear drum, which was bulging and draining, as well as granulation tissue.
5. Dr. Crossley referred plaintiff for an audiological evaluation. On February 21, 1997, Cary W. Pahel performed and audiological evaluation which revealed both conductive hearing loss and mild sensorineural hearing loss. Specifically, plaintiff's hearing thresholds were as follows: in the right ear, 30 decibels at 500 hertz, 30 decibels at 1,000 hertz, 20 decibels at 2,000 hertz and 20 decibels at 4,000 hertz; in the left ear 20 decibels at 500 hertz, 20 decibels at 1,000 hertz, 15 decibels at 2,000 hertz and 10 decibels at 4,000 hertz.
6. On February 24, 1997 Dr. Crossley performed surgery on plaintiff's ear, including removal of granulation tissue, exploratory tympanotomy and tympanoplasty with Type III tympanoplasty with ossicular incus lenticular process weakness. During surgery Dr. Crossley discovered a tympanic membrane perforation, heavy granulation tissue and some erosion of the lenticular process of the incus with weakness and thinness. Dr. Crossley's post-operative diagnosis was granulation tissue with tympanic membrane perforation and ossicular chain abnormality.
7. Dr. Crossley opined that plaintiff's ear condition for which he performed surgery in February 1997, and her mild sensorineural hearing loss were caused by chronic ear infections.
8. Plaintiff's hearing subjectively improved following the surgery performed by Dr. Crossley in February of 1997.
9. In June, 1997, plaintiff applied for a job as a telecommunicator with defendant. Plaintiff underwent a pre-employment audiological evaluation which revealed the following hearing thresholds: in the right ear, 5 decibels at 500 hertz, 0 decibels at 1,000 hertz, 5 decibels at 2,000 hertz, and 0 decibels at 3,000 hertz; in the left ear, 10 decibels at 500 hertz, 5 decibels at 1,000 hertz, 10 decibels at 2,000 hertz, and 10 decibels at 3,000 hertz.
10. In July 1997, plaintiff began working for defendant as a telecommunicator, which involves sitting at a computer console using a computer dispatch system, answering the telephone and dispatching calls via radio for the Greensboro Police Department and Greensboro Fire Department.
11. Plaintiff uses a telephone headset to perform her job duties. Initially, plaintiff used the ear bud type Plantronics headset, Model No. H31 which was used briefly. From 1997 until approximately 2002, plaintiff primarily used the Plantronics binaural headset Model No. H101. From approximately 2002, plaintiff has used the monaural Plantronics Model No. H91. Each of these headsets is connected to an amplifier which plugs into the computer console or station at which plaintiff works. The amplifier has a volume control, which plaintiff is able to adjust throughout the day.
12. The Plantronics headsets used by plaintiff were designed with safety features that limit impulsive and continuous noise exposure to levels below OSHA mandated noise maximums.
13. The majority of noise that plaintiff hears in her job as a telecommunicator is human voices, with occasional background noise such as a siren. The radios over which police officers and firefighters transmit to plaintiff have noise canceling microphones that block out some of the ambient or environmental noise.
14. The noise plaintiff hears on the headset is not continuous; there are breaks in communication when plaintiff is neither taking telephone calls nor hearing any traffic over the radio. During these periods, plaintiff and other telecommunicators may perform other activities such as reading or watching television. The periods of time during which plaintiff is receiving a call or dispatching a police officer or firefighter via radio are interspersed with quiet periods when there is no noise. There are also periods of time when plaintiff is entering data into a computer or communicating with a police officer via computer. If plaintiff is answering a telephone line, any radio traffic during that time period will be broadcast out of a speaker on her console. The radio traffic is not constant but is interspersed with periods of quiet.
15. Although plaintiff worked an eight hour shift for approximately one year, the majority of time plaintiff has worked for defendant has involved a work day of 11.25 hours. Plaintiff has a one hour break for lunch and two fifteen minute breaks during the course of her work day.
16. During the course of her employment with defendant, plaintiff has continued to suffer problems with recurrent ear infections, upper respiratory infections, sinusitis, bronchitis, labyrinthitis, and allergic rhynitis.
17. Plaintiff has been treated for these complaints on numerous occasions, including the following days: August 24, 1998, December 4, 1998, February 20, 1999, October 1, 1999, May 31, 2000, September 11, 2000, September 25, 2000, March 5, 2003, March 17, 2003, April 11, 2003, May 15, 2003, July 3, 2003, July 25, 2003, August 4, 2003, August 6, 2003, August 20, 2003, September 22, 2003, and November 13, 2003. Plaintiff consistently reported ear pain, sore throat, and inability to hear. Plaintiff was repeatedly diagnosed with ear infections and treated with antibiotics.
18. On March 5, 2003, plaintiff was seen by Dr. Maura Hamrick who noted that both tympanic membranes had scarring.
19. On March 17, 2003, plaintiff presented to Dr. John C. Mundy, an otolaryngologist. Dr. Mundy's evaluation revealed a tympanic membrane perforation in the right ear. An audiogram revealed bilateral conductive hearing loss, greater on the left side. Dr. Mundy interpreted the audiogram to indicate conductive hearing loss in both ears and a mild sensorineural hearing loss in the left ear.
20. After continued pain and problems with hearing loss, Dr. Mundy performed surgery on plaintiff's left ear on May 15, 2003 to attempt to eliminate her conductive hearing loss. Prior to surgery, Dr. Mundy explained to plaintiff the potential risks and complications of this surgery, including greater hearing loss. The surgery consisted of a tympanoplasty with ossiculoplasty in the left ear. During surgery, examination of the ossicles showed that the long process of the incus was eroded into a point which was no longer in contact with the stapes superstructure. The superstructure of the stapes was fractured, the capitulum was hypermobile, and there was a minimal movement of the footplate. Dr. Mundy performed a reconstruction by using a house wire extending from the incus remnant to the footplate of the stapes.
21. Following surgery, plaintiff reported that her hearing had improved significantly Dr. Mundy interpreted an audiogram taking on June 24, 2003 to indicate no sensorineural hearing loss in the left ear on that date.
22. Plaintiff returned to Dr. Mundy with complaints of itching behind her left ear as well as some throbbing discomfort on July 3, 2003. On July 25, 2003, plaintiff complained of disequilibrium and a change in her hearing, and on August 4, 2003 complained of an echo in her left ear.
23. On August 20, 2003, Dr. Mundy opined that the house wire in plaintiff's left ear was loose. He recommended surgery, which was performed on September 22, 2003. Dr. Mundy performed a tympanoplasty with ossiculoplasty of the left ear. Prior to surgery, Dr. Mundy again informed plaintiff of the potential risks and complications of the surgery, including decreased hearing. During surgery, Dr. Mundy discovered adhesions from the tympanic membrane to the promontory into the area of the round window niche, as well as dense adhesions surrounding the oval window, which he carefully divided. The incus was eroded and tapered to a point which almost touched the top of the stapes. Instead of using another prosthesis, Dr. Mundy obtained bone from the ear canal and inserted that between the two ossicles.
24. Plaintiff reported improved hearing following the surgery, and was released to return to light duty work on October 3, 2003.
25. On October 13, 2003, plaintiff told Dr. Mundy that her hearing was improving. Dr. Mundy released plaintiff to return to full duty work, and testing indicated that plaintiff had elimination of all or most of her conductive hearing loss.
26. Plaintiff returned to Dr. Mundy on November 13, 2003. Her left ear drum was slightly retracted, but there was no fluid in the ear. Following a hearing test, Dr. Mundy opined that surgery had resulted in complete elimination of the conductive hearing loss in the left ear at 500 hertz and at the higher frequencies, and that plaintiff had mild sensorineural hearing loss.
27. Plaintiff continued to perform her regular job as a telecommunicator with defendant until September 2004, at which time plaintiff was promoted to Supervisor I. In her job as a supervisor, plaintiff still handles calls and uses a headset on occasions when the call center is short handed, extremely busy, and if she is relieving someone at lunchtime or for a break. The amount of time plaintiff handles calls and uses a headset varies depending upon how busy things are and her other administrative duties. There have been occasions when she has spent several hours in a day taking calls, using a headset at a console, either filling in for someone who could not be there or relieving someone for a lunch break.
28. Conductive hearing loss is the result of some loss of sound energy between the surface of the ear drum, or tympanic membrane, and the inner ear. Conductive hearing loss may be caused by a problem with the ear drum, such as a hole in the ear drum, or a problem with the middle ear, such as fluid or an abnormality of the ossicles, the three small bones within the middle ear. Conductive hearing loss may also be caused by recurrent or chronic ear infections, tympanosclerosis, otosclerosis, and problems with or malfunction of the Eustachian tube caused by upper respiratory infections or allergies.
29. Sensorineural hearing loss is the loss of hearing related either to the cochlea, the sensory organ in the inner ear, or to the nerve between the inner ear and the brain stem. There are numerous potential causes of sensorineural hearing loss, including heredity or genetic pre-disposition, genetic abnormalities in the proteins within the ear, ototoxic drugs, noise exposure, aging, chronic ear infections (both viral and bacterial), otosclerosis, injuries to the inner ear with tears of the inner ear or membrane rupture, auditory nerve tumors, and Meniere's disease. Sensorineural hearing loss is also a potential complication of the surgeries performed on plaintiff by Dr. Mundy. Those surgeries can result in post-operative labyrinthitis, inflammation of the structures of the inner ear, which can cause sensorineural hearing loss.
30. Plaintiff returned to Dr. Mundy on January 28, 2005 and reported that she was occasionally exposed to what she described as loud sound at her job, although she did not recall any specific noise injury. Physical examination revealed that the left tympanic membrane was intact but slightly retracted. The right tympanic membrane was intact. Rinne testing showed a positive tuning fork at 256 hertz in both ears. Repeat audiological evaluation revealed the following hearing thresholds: in the right ear, 45 decibels at 500 hertz, 35 decibels at 1,000 hertz and 30 decibels at 2,000 hertz (3,000 hertz was not tested); in the left ear, 40 decibels at 500 hertz, 30 decibels at 1,000 hertz, and 30 decibels at 2,000 hertz (3,000 hertz was not tested). Dr. Mundy interpreted this audiogram to indicate bilateral sensorineural hearing loss as well as a minimal conductive hearing loss. He noted that speech reception thresholds were 25 decibels in the right ear and 35 decibels in the left ear. Speech discrimination was 100% bilaterally.
31. Dr. Mundy opined that plaintiff's audiogram was not suggestive of noise-induced hearing loss. Dr. Mundy further testified that it is unlikely that plaintiff's sensorineural hearing loss was caused by noise exposure, as noise induced hearing loss typically occurs to a greater extent in the higher frequencies, whereas plaintiff's hearing loss is greater in the lower frequencies. While Dr. Mundy testified that if plaintiff were exposed to greater than 90 decibels of noise over an eight hour work shift on a daily basis, such exposure could have contributed to her sensorineural hearing loss, he also made it clear that it was possible but unlikely. Dr. Mundy's testimony remained that it is unlikely that plaintiff's sensorineural hearing loss is noise induced.
32. Plaintiff treated with Dr. Crossly on January 28, 2005. Upon physical examination, plaintiff's left tympanic membrane was intact but thinner and slightly retracted. The mobility of the ossicular chain was not as great as in the right ear. Dr. Crossly subsequently reviewed Dr. Mundy's records, including the audiogram. Dr. Crossley opined that plaintiff's sensorineural hearing loss is probably caused by chronic ear infections, based on the fact that plaintiff's sensorineural hearing loss was greater in the lower frequencies than in the higher frequencies. Dr. Crossley opined that plaintiff's sensorineural hearing loss is not likely due to noise exposure.
33. Dr. Crossley also noted that based upon his conversations with plaintiff and the nature of her job duties as a telecommunicator, it was his impression that plaintiff was not exposed to continuous noises around the high 80s decibel level or to impulse noise in the area of 140 decibels. Further, Dr. Crossley explained that if hearing loss was caused by exposure to prolonged noise within those levels, then the hearing loss would be experienced in the upper frequencies, not the lower frequencies.
34. Based upon the greater weight of the evidence, including the testimony of Dr. Mundy and Dr. Crossley, plaintiff has not suffered hearing loss from noise exposure.
35. Plaintiff has not been removed from exposure to the alleged harmful noise that she contends caused her hearing loss, thus six months had not elapsed since her last alleged noise exposure when she filed her claim.
36. While plaintiff's prosecution of this claim without prior medical opinion regarding the cause of her hearing loss was unfortunate, the undersigned, in their discretion, decline to award defendants' attorney's fees.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to establish a prima facie case of occupational loss of hearing, plaintiff must prove: (1) permanent sensorineural loss of hearing in both ears which was (2) caused by harmful noise in her work environment. McCuiston v. Addressograph-Multigraph Corp., 308 N.C. 665,303 S.E.2d 795 (1983).
2. Plaintiff failed to carry the burden of proving by competent evidence that a causal relationship existed between the work-related accident and the disability for which compensation is sought. Click v.Freight Carriers, 300 N.C. 164, 265 S.E.2d 389 (1980).
3. Plaintiff's sensorineural hearing loss was not caused by prolonged exposure to harmful noise in her employment. Therefore, plaintiff does not suffer from occupational loss of hearing within the meaning of N.C. Gen. Stat. § 97-53(28)(b).
4. Plaintiff's conductive hearing loss, which has now been ameliorated by several surgeries, is not compensable under the Workers' Compensation Act. N.C. Gen. Stat. § 97-53(28).
5. Even if plaintiff had proven that she suffers from permanent sensorineural loss of hearing in both ears caused by prolonged exposure to harmful noise in her employment, which she has failed to do, plaintiff claim should be dismissed because plaintiff has not been removed from what she contends is alleged exposure to harmful noise. Thus, the six month waiting period had not yet expired when plaintiff filed her claim. N.C. Gen. Stat. § 97-53(28)(i).
6. In the discretion of the undersigned, defendants will not be awarded attorney's fees as a result of plaintiff's prosecution of this claim without reasonable ground. N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits must be, and is hereby, DENIED.
2. Each side shall pay its own costs.
This the 11th day of January, 2007.
S/ _____________________________ DIANNE C. SELLERS, COMMISSIONER
CONCURRING:
 S/ _____________________________________ LAURA KRANIFELD MAVRETIC, COMMISSIONER,
 S/ ________________________________ CHRISTOPHER SCOTT, COMMISSIONER